Argued and submitted on February 26, at Portland Community College, Portland,
affirmed June 24, 2009

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

MARIA SCHNEIDER,
*Defendant-Appellant.*

Deschutes County Circuit Court
03FE0555AB; A130729

211 P3d 306

Erica Herb, Deputy Public Defender, argued the cause for appellant. With her on the brief was Peter Gartlan, Chief Defender, Legal Services Division, Office of Public Defense Services.

Inge D. Wells, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Haselton, Presiding Judge, and Armstrong, Judge, and Rosenblum, Judge.

HASELTON, P. J.

**HASELTON, P. J.**

Defendant appeals from a judgment of conviction for one count of criminal mistreatment in the second degree, ORS 163.200(1)(a), assigning error to the trial court's denial of her motion for a judgment of acquittal (MJOA). Defendant asserts that the state failed to present legally sufficient evidence that she "with[held] necessary and adequate * * * physical care or medical attention" from the victim. *Id.* As explained below, we conclude that defendant's conduct in moving the victim to the home of her friend without the victim's prescription medications constituted "withhold[ing] necessary and adequate * * * medical attention" within the meaning of the criminal mistreatment statute because it precluded the victim from receiving those medications at the prescribed time. Consequently, we affirm.

We review the denial of an MJOA to determine whether, after viewing the facts in the light most favorable to the state, a rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt. *State v. Cunningham*, 320 Or 47, 63, 880 P2d 431 (1994), *cert den*, 514 US 1005 (1995). Although defendant moved for a judgment of acquittal at the close of the state's evidence, we consider the whole record to determine whether there is sufficient corroborative evidence. *See State v. Lamphere*, 233 Or 330, 332, 378 P2d 706 (1963) (when error is assigned to the denial of an MJOA, appellate courts consider the whole record to determine whether there is sufficient evidence to support a conviction). Consistently with that standard of review, the operative facts are as follows.

In May 2000, Willy Lackey contacted his nephews, Ray and Mark Lackey, and requested that they help care for him because he was elderly and could no longer live alone.[1] Willy suffered from congestive heart failure, blood pressure problems, depression, anxiety, and prostate cancer, and was experiencing signs of early dementia. Willy also had chronic edema—retention of fluids and swelling—in his lower

---

[1] To avoid confusion, we refer to Willy, Mark, and Ray Lackey by their first names.

extremities. The nephews moved Willy from Montana to Mark's house in Redmond.

In August 2000, Willy was diagnosed with terminal lung cancer, and his physician referred him to hospice for care. In September 2000, Mark hired defendant as Willy's caregiver. Shortly thereafter, defendant moved into Mark's home to provide Willy with 24-hour care.

Defendant was responsible for, among other duties, administering Willy's medications. Willy took two diuretics to remove extra fluids—one in the morning and one twice a day—plus a blood pressure or heart medication once a day. Willy also took two "p.r.n."[2] (as necessary) medications: an antianxiety medication and morphine. The morphine was prescribed for Willy's "pain from his cancer" and "decrease[d] the work that [Willy's] heart ha[d] to do in congestive heart failure." Willy was on morphine, which could be dispensed up to once every hour, "multiple times a day." Although Willy's mobility was impaired and he could not leave the house independently, he was lucid and able to communicate.

In December 2000, defendant began to have problems and disagreements with Mark regarding Willy's care. Those disagreements culminated in an incident in January 2001 in which Willy became upset and unhappy with Mark and sided with defendant. Sometime thereafter, Willy began expressing a strong desire to return to Montana. Defendant, along with Brookshire, a high school friend of Mark's, made a plan to take Willy back to Montana. Brookshire purchased a motor home for the trip in late January.

Willy's family was not informed of that plan. Although hospice nurses were aware that Willy wanted to go to Montana and had discussed options with Willy, defendant did not involve hospice in her plan. Willy's physician also was not informed of defendant's plan and testified at trial that it would not have been in Willy's best interests to travel to Montana without first checking in with either the physician or hospice.

---

[2] A "p.r.n." (*pro re nata*) medication is taken "as the occasion arises; when necessary." *Stedman's Medical Dictionary* 1445 (27th ed 2000).

On the morning of January 31, 2001, defendant moved Willy to the home of a friend, Harvey, where defendant was renting an additional room. Defendant then went to the bank where Willy had a joint checking account with his nephews. Defendant attempted to close out the account, using a power of attorney that defendant had helped Willy execute in her favor. Defendant informed the bank teller that Willy wanted to go to Montana and that she was withdrawing the funds for that purpose. The teller became "a little nervous" and, after speaking to her supervisor, informed defendant that it would take some time before she could give defendant the funds. The teller then called Mark, who notified Ray about the situation, and Ray called the police to report that Willy was possibly being "kidnapped."

Redmond Police Officer Dickson, joined by another officer, Ludwig, went to Harvey's home to investigate the possible kidnapping. Upon their arrival, defendant informed the officers that she was caring for Willy, that Willy was there at the home with her, and that he was fine. Defendant led the officers to a back bedroom, where Willy was sitting on the bed. Willy was smiling and in "good spirits," but, consistently with his chronic edema, his lower extremities were swollen. Ludwig then asked defendant to step out of the bedroom and into the living room, while Dickson stayed with Willy to question him alone. Willy was alert and able to answer Dickson's questions.

At some point during Ludwig's questioning of defendant in the living room, she abruptly turned and, hurriedly, walked into the back bedroom where Dickson was questioning Willy. The officers repeatedly ordered defendant to leave the bedroom, but she refused and became uncooperative. The officers ultimately arrested defendant for resisting arrest and interfering with a police officer.[3]

After defendant's arrest, the officers contacted Oregon Senior and Disabled Services (SDS). Lockridge, an Adult Protective Services investigator from SDS, arrived to find Willy in good spirits. At some point, Willy informed

---

[3] That conduct was charged and tried separately from the charge at issue in this case.

Lockridge that he needed to have his medications. Lockridge searched the house, the motor home, and defendant's car for Willy's medications, but could not find them. Neither the officers nor Lockridge attempted to ask defendant if Willy's medications were in any of those locations. Willy also informed Dickson that he needed some medications "at that time." Dickson believed that "Willy was apparently overdue on medication and should have had some."

Lockridge then called hospice, and hospice sent a nurse, Schwing, to Harvey's residence to assist in Willy's care. When Schwing arrived, Willy was lying down in the back bedroom and was "clear," "lucid," "knew where he was," and "knew what the plan was." Schwing called pharmacies and obtained refills of all of Willy's medications and arranged transportation for Willy to a nearby care center.

The next day, police seized defendant's car and the motor home pursuant to a warrant and later searched them, but they found no medications. Based on those events, a grand jury charged defendant with, *inter alia*, criminal mistreatment in the second degree,[4] ORS 163.200(1)(a) (Count 4). That statute provides, in part:

> "A person commits the crime of criminal mistreatment in the second degree if, with criminal negligence and:
>
> "(a)   In violation of a legal duty to provide care for another person, the person withholds necessary and adequate * * * physical care or medical attention from that person[.]"

Criminal negligence, in turn, is defined as:

> " 'Criminal negligence' or 'criminally negligent,' when used with respect to a result or to a circumstance described by a statute defining an offense, means that a person fails to be aware of a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that the failure to be aware of it constitutes a gross deviation from the standard

---

[4] Defendant was also charged with four counts of first-degree criminal mistreatment (Counts 1 to 3 and 8), three counts of first-degree theft (Counts 5 to 7), and one count of second-degree theft (Count 9). Counts 1 to 6 arose out of the events recounted here; Counts 7 to 9 involved events unrelated to defendant's conduct with Willy.

of care that a reasonable person would observe in the situation."

ORS 161.085(10).

As relevant here, the indictment alleged that defendant

"did, with criminal negligence and in violation of a legal duty to provide care for WILLIAM LACKEY, unlawfully withhold necessary physical or medical attention from said WILLIAM LACKEY."

At the close of the state's case, defendant moved for a judgment of acquittal with respect to Count 4.[5] Defendant did not challenge the sufficiency of the state's proof with respect to the requisite "criminally negligent" mental state. Rather, defendant argued solely that the state had failed to establish that defendant had "with[held] necessary and adequate * * * physical care or medical attention" from Willy. ORS 163.200(1)(a).[6]

The state countered that, based on evidence of the events of January 31, defendant was culpable in either of two ways. *First*, the state contended that defendant had violated the statute by undertaking to move Willy to Montana without first taking the proper medical steps, including obtaining the advice and involvement of either hospice or his doctor. *Second*, the state contended that, because none of Willy's prescribed medications could be found inside Harvey's home, the motor home, or defendant's car, defendant had withheld necessary and adequate physical care or medical attention because Willy did not have his medications on site and "[t]hose items were necessary for Willy['s] * * * care."

Defendant responded that she "was never in a position to provide or withhold * * * the medications after she was taken into custody" and, because the officers never asked

---

[5] Defendant also moved, unsuccessfully, for a judgment of acquittal on all other counts.

[6] Thus, defendant did not dispute that, if the evidence was sufficient to establish that her conduct had effected a "withhold[ing] [of] necessary and adequate * * * physical care or medical attention" within the meaning of ORS 163.200(1)(a), a jury could find that, in the totality of the circumstances, defendant acted with the requisite mental state.

her about medications, she did not have the opportunity to inform them where the medications were. The trial court denied defendant's MJOA.

Subsequently, during the defense case, defendant testified that Willy's medications were present on site but that they had fallen between the bed and the oxygen condenser during her altercation with police officers. Defendant introduced as evidence medications that she contended she had found in that location four days later when she had returned to Harvey's residence upon being released from custody.

During closing arguments, counsel for defendant argued that the medications were on site but that Lockridge and Dickson did not find them because they conducted only a "cursory search" of Harvey's home. Counsel further argued that, if someone had only asked defendant where the medications were, she could have told them where she had seen them last. The jury ultimately returned a guilty verdict on the second-degree criminal mistreatment count.[7]

On appeal, defendant contends that the trial court erred in denying her MJOA on Count 4, reiterating that the state failed to prove that defendant "with[held] necessary and adequate * * * physical care or medical attention." As explained below, we conclude that the state presented legally sufficient evidence that defendant's conduct effected a withholding of "necessary and adequate * * * medical attention" from Willy. Specifically, other care providers were not able to administer medications, as prescribed, because of defendant's criminally negligent failure to have those medications readily available.

As noted, ORS 163.200(1)(a) provides that a person commits the crime of second-degree criminal mistreatment if the person, "with criminal negligence," and

---

[7] The jury returned a verdict of not guilty on three counts of first-degree criminal mistreatment (Counts 1, 3, and 8), the three counts of first-degree theft (Counts 5 to 7), and the one count of second-degree theft (Count 9). The jury was deadlocked and did not reach a verdict on one count of first-degree criminal mistreatment (Count 2).

"[i]n violation of a legal duty to provide care for another person, * * * withholds necessary and adequate * * * medical attention from that person[.]"

We previously construed the phrase "withholds necessary and adequate * * * medical attention" in *State v. Bordeaux*, 220 Or App 165, 185 P3d 524 (2008). In *Bordeaux*, the issue was whether the defendant's conduct in lying to emergency room personnel about the cause of his son's injuries—namely, that they had been inflicted by the defendant—constituted "withhold[ing] necessary and adequate * * * medical attention" within the meaning of the first-degree criminal mistreatment statute, ORS 163.205(1)(a).[8] 220 Or App at 167. We concluded that, because a construction of the statute criminalizing such conduct would essentially require a person to confess to one crime (criminal mistreatment for causing physical injury) to avoid being guilty of another (criminal mistreatment for withholding medical attention), the legislature did not intend the statute to encompass the failure to disclose to medical personnel inculpatory information about the cause of a child's injuries. *Id.* at 175-76.

■ Although our interpretation and application of ORS 163.205(1)(a) in *Bordeaux* ultimately pertained to the particular—and, indeed, somewhat idiosyncratic—circumstances presented there, our discussion of the operative statutory terms "medical attention" and "withholds" informs our analysis in this case. Although we did not determine the ultimate contours of the term "medical attention" in *Bordeaux*, implicit in our analysis was that that term encompasses at least "medical care." *See generally* 220 Or App at 172-73. As pertinent to the circumstances of this case, the administration of prescription medication is "medical care" and, thus, constitutes "medical attention" for purposes of ORS 163.200(1)(a).

---

[8] ORS 163.205(1)(a) provides, in part:

"A person commits the crime of criminal mistreatment in the first degree if:

"(a) The person, in violation of a legal duty to provide care for another person, * * * intentionally or knowingly withholds necessary and adequate * * * medical attention from that other person[.]"

■ In *Bordeaux*, we also addressed the meaning of "withhold":

> " 'Withhold' is defined in pertinent part to mean, '1: hold back : keep from action : CHECK, RESTRAIN * * * 2: to desist or refrain from granting, giving or allowing : keep in one's possession or control : keep back * * *.' *Webster's Third New Int'l Dictionary* 2627 (unabridged ed 2002)."

220 Or App at 171 (omissions in *Bordeaux*; boldface in *Webster's*). Consistently with that definition, and subject to the "provision of self-inculpatory information" exception adopted in *Bordeaux*, an operative "withhold[ing]" occurs when the defendant—a person with a "legal duty to provide care," ORS 163.200(1)(a)—has engaged in conduct that prevents the victim from actually receiving necessary and adequate medical attention.

■ We return to the evidence in this case, again viewed most favorably to the state. Based on that evidence, a jury could find that defendant failed to have Willy's prescription medications readily available for administration as required. Notwithstanding extensive efforts by Lockridge, the SDS investigator, and, later, by police officers, none of Willy's medications was ever found in Harvey's home, the motor home, or in defendant's car. The jury could further find that, at a time when the medications were not available on site, an actual need for administration of Willy's prescription medications arose. Willy informed Lockridge that he needed to have his medications and informed Dickson that "some medications were needed at that time." Dickson testified that "Willy was apparently overdue on medication and should have had some." Finally, the jury could find that, because of defendant's criminally negligent failure to have Willy's prescribed medications readily available on site, Willy was unable to receive his prescription medications as required.

Defendant argues nevertheless that she cannot be liable for "withholding" under the statute because she had been arrested and the officers never asked where the drugs were.[9] Defendant's argument misses the mark. The premise

---

[9] Defendant did not argue that, but for her arrest, she would otherwise have been able to procure the medications—for example, by picking them up elsewhere

of defendant's contention is that the medications were on site—and that, if she had been asked, she could have informed the officers where they were. However, as noted, the state presented evidence from which the jury could find that the medications were not, in fact, present in Harvey's residence or readily available nearby (*viz.*, in defendant's car or the motor home). Thus, the fact that the officers did not ask defendant where the medications were is immaterial. Defendant's predicate conduct in failing to have the medications readily available so that they could be administered when actually required effected the operative withholding.

Affirmed.

---

and bringing them to Harvey's residence—before the need to administer them actually arose. Again, defendant's consistent position was that the medications were on site, but that Lockridge and the officers failed to locate them because they engaged in merely a "cursory search" of Harvey's residence.